## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| City of Minneapolis,<br>individually and on behalf of all others<br>similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>Frank A. Reichl, General Chemical<br>Corporation, General Chemical Performance<br>Products, LLC, Gentek, Inc., Chemtrade<br>Logistics Income Fund, Chemtrade<br>Logistics, Inc., GEO Specialty Chemicals,<br>Inc., C&S Chemicals, Inc., USALCO, LLC,<br>Thatcher Group, Inc., Kemira Chemicals,<br>Inc., and John Does 1-50.<br><br>     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................2

III.    THE PARTIES ....................................................................................................3

        A.      PLAINTIFF ..............................................................................................3

        B.      DEFENDANTS ........................................................................................3

IV.     UNIDENTIFIED CO-CONSPIRATORS .........................................................11

V.      FACTUAL ALLEGATIONS ............................................................................12

        A.      Background Regarding the Alum Industry. ...........................................12

        B.      The Characteristics of the Alum Market in the United States Make it
                Susceptible to Collusion. ......................................................................14

                1.      Alum Is A Commodity Product With A High Degree Of
                        Interchangeability. ......................................................................15

                2.      Input Costs For Alum Were Stable Or Declining For Much
                        Of The Class Period. ...................................................................17

                3.      Alum Experienced Weak Demand In A Mature Market
                        During The Class Period. .............................................................20

                4.      There Are No Apparent Economic Substitutes For Alum. ..............22

                5.      There Are Significant Barriers to Entry in the Alum Market. .........23

                6.      Opportunities to Collude Facilitated Defendants' Conspiracy. .......24

                7.      The Alum Industry Is Highly Concentrated And Has
                        Experienced Heavy Consolidation. ..............................................27

                8.      There Is A History Of Collusive Conduct In The Water
                        Treatment Chemicals Market. ......................................................29

        C.      U.S. DOJ INVESTIGATION AND GUILTY PLEA ................................30

        D.      DEFENDANTS' CONDUCT IS CONSISTENT WITH REICHL'S
                GUILTY PLEA. ......................................................................................34

1.    Evidence Shows That Defendants Agreed Not To Pursue Alum Business With Each Other's "Historical" Customers. ........... 35

2.    Defendants And Their Co-Conspirators Submitted Intentionally Losing, "Throw-Away" Bids Or Price Quotes To Each Other's "Historical" Customers. ......................................... 36

3.    Defendants Withdrew Inadvertently Winning Bids Submitted To Each Other's "Historical" Customers. ......................................... 38

VI.    CLASS ACTION ALLEGATIONS ........................................................ 39

VII.    ANTITRUST INJURY ........................................................................... 42

VIII.    FRAUDULENT CONCEALMENT .................................................... 43

IX.    CLAIM FOR RELIEF FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 .............................................................. 45

REQUEST FOR RELIEF ................................................................................. 48

# I.    INTRODUCTION

1.    Plaintiff City of Minneapolis ("Plaintiff"), brings this action both individually and on behalf of a Class consisting of all persons and entities in the United States who purchased liquid aluminum sulfate ("Alum") directly from Defendants[1] at any time from January 1, 1997 through at least July 31, 2010 or until the cessation of the anticompetitive effects of Defendants' wrongful conduct as alleged herein (the "Class Period").  Plaintiff seeks to recover damages incurred by it and the Class due to Defendants' and their co-conspirators' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to increase prices and otherwise restrain competition in the market for Alum sold to Plaintiff and Class Members during the Class Period. Defendants' conspiracy included but was not limited to their agreement to circumvent competitive bidding and independent pricing for liquid aluminum sulfate contracts and to submit artificially inflated bids.

2.    Alum is a versatile chemical that can function as a coagulant, flocculant, precipitant, and emulsion breaker.  Alum removes turbidity, suspended solids, total organic carbon, and biochemical oxygen demand.  Alum is used in both municipal and industrial applications.

3.    Defendants are manufacturers and distributors of Alum used by municipalities to treat potable water and wastewater, by pulp and paper manufacturers as

---

[1] "Defendants" include Frank A. Reichl, General Chemical Corporation, General Chemical Performance Products, LLC, Gentek, Inc., Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., GEO Specialty Chemicals, Inc., C&S Chemicals, Inc., USALCO, LLC, Thatcher Group, Inc., Kemira Chemicals, Inc., and John Does 1-50.

part of their manufacturing processes, and in lake treatment to reduce phosphorous levels contributing to degraded water quality. Alum is also used to fix dyes to fabrics and textiles and by poultry houses as a litter amendment to control ammonia.

4.     During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which Alum would be sold. As more fully detailed *infra*, Frank Reichl, a former senior executive at Defendant General Chemical Corporation, has already pleaded guilty to participating in this conspiracy. General Chemical Corporation has been granted conditional amnesty by the United States Department of Justice for its conduct relating to the Alum conspiracy, which as described further below, required that General Chemical admit to engaging in criminal anti-competitive conduct with its competitors. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Class paid more for Alum than they would have if a competitive market had determined Alum prices.

5.     Plaintiff and Class Members sustained damages as a result of Defendants' and co-conspirators' anticompetitive conduct as alleged herein.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331 & 1337(a).

7.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period, the Defendants transacted

substantial business in this district.  Venue is also proper in this district because much of the conduct giving rise to Plaintiffs' claims occurred in Minnesota.

8.    This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the U.S., including in this district; (b) participated in the manufacturing and distribution of Alum throughout the U.S., including in this district; (c) had substantial contacts with the U.S., including in this district; and/or (d) was engaged in an illegal scheme and competition-elimination conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the U.S., including in this district.

## III.    THE PARTIES

### A.    PLAINTIFF

9.    Plaintiff City of Minneapolis is a municipal corporation of the State of Minnesota with its principal place of business at 350 S. 5th Street, Minneapolis, Minnesota 55415. During the Class Period, Plaintiff directly purchased Alum from one or more of the Defendants, and has suffered antitrust injury as a result of Defendants' wrongful conduct as alleged in this complaint.

### B.    DEFENDANTS

10.    Defendant Frank A. Reichl is a resident of Flanders, New Jersey.  At all relevant times, Reichl actively conspired with Defendants and co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.  At all relevant times except for the period from approximately July 2005 to approximately December 2006, Reichl held

high-level executive positions with Defendant General Chemical.  On October 27, 2015,

Reichl pleaded guilty for his role in the conspiracy as described herein.

11.     Defendant General Chemical Corporation was a corporation existing under

the laws of Delaware, with its principal place of business at 90 East Halsey Road,

Parsippany, New Jersey.  General Chemical Corporation maintained Alum manufacturing

and distribution facilities throughout the United States and was a leading manufacturer

and supplier of water treatment chemicals, including Alum.  During the Class Period,

directly or through its subsidiaries and affiliates, General Chemical Corporation sold

Alum throughout the United States.  General Chemical Corporation was owned by the

General Chemical Group, Inc. until April 30, 1999, when its business was spun off into a

holding company known as GenTek, Inc.  On January 23, 2014, Defendant Chemtrade

Logistics Income Fund, a Canadian entity, acquired all of the business of General

Chemical and its subsidiaries, including all of General Chemical's assets and liabilities

("Chemtrade Acquisition").  General Chemical Corporation has been granted conditional

amnesty by the United States Department of Justice for its conduct relating to the Alum

conspiracy, which required that General Chemical admit to engaging in criminal anti-

competitive conduct with its competitors.

12.     Defendant General Chemical Performance Products LLC was a limited

liability company existing under the laws of Delaware, with its principal place of

business at 90 East Halsey Road, Parsippany, New Jersey. During the Class Period,

directly or through its subsidiaries and affiliates, General Chemical Performance Products

sold Alum throughout the United States.  General Chemical Performance Products was sold as part of the Chemtrade Acquisition.

13.     Defendants General Chemical Corporation and General Chemical Performance Products, LLC, are referred to collectively herein as "General Chemical." At all relevant times, General Chemical fully authorized or ordered Reichl's participation in the conspiracy alleged in this complaint.

14.     Defendant GenTek Inc. ("GenTek") is a publicly traded Delaware corporation, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  General Chemical was a wholly owned and controlled subsidiary by GenTek from approximately 1999 to approximately October 2009.  At all relevant times, as General Chemical's parent company, GenTek was fully aware of General Chemical's role and participation in its unlawful price-fixing and bid-rigging conspiracy as described herein.  During the Class Period, directly or through its subsidiaries and affiliates, GenTek sold Alum throughout the United States.

a)      Around October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of its subsidiaries, including General Chemical Corporation.  Effective October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy under a plan of reorganization.  GenTek and General Chemical Corporation participated in the conspiracy alleged

herein throughout the Class Period through the actions of many of GenTek's and General Chemical's senior executives.

b)    After its discharge from bankruptcy, GenTek and General Chemical reaffirmed their participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to Alum. Specific post-discharge actions taken by GenTek and General Chemical in furtherance of the conspiracy are alleged (see below) and are consistent with the actions taken by all of the Defendants, GenTek, and General Chemical throughout the Class Period.

c)    Regardless of whether GenTek and General Chemical participated in the conspiracy throughout the Class Period or joined and/or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this complaint seeks to recover damages from GenTek and General Chemical only for GenTek's and General Chemical's post-discharge conduct, and in no way seeks to violate any orders of the Bankruptcy Court. However, by operation of law, the damages arising from GenTek's and General Chemical's post-discharge conduct include damages incurred by Plaintiff and the Class throughout the Class Period. This complaint also seeks to recover damages from the remaining Defendants for GenTek's and General Chemical's pre-discharge conspiratorial conduct. Therefore, Plaintiff pleads only a single class period as to all

Defendants, but damages as to GenTek and General Chemical are governed by the principles of joint and several liability as noted above.

15.    Defendant Chemtrade Logistics Income Fund ("CLIF") is a limited purpose trust established on July 11, 2001 under the laws of the Province of Ontario, Canada with its principal place of business at Suite 300, 155 Gordon Baker Road, Toronto, Ontario M2H 3N5.   As noted above, in 2014, CLIF finalized the Chemtrade Acquisition and thereby acquired the assets and liabilities of General Chemical and its subsidiaries.   As a result, it bears financial responsibility for the pre-acquisition conduct described herein and has acknowledged that it might be sued for such conduct.   CLIF has also indicated that GenTek has agreed to indemnify it, at least in part, as further described below.

16.    Defendant Chemtrade Logistics Inc. is a publicly traded Canadian corporation, with its principal places of business at 90 East Halsey Road, Parsippany, New Jersey and Ontario, Canada.   General Chemical was absorbed into Chemtrade through the Chemtrade Acquisition in January 2014, with the latter assuming all rights and obligations of General Chemical.   As the legal successor in interest to General Chemical, Chemtrade assumes the liability of damages caused by General Chemical's participation in the conspiracy to fix prices and rig bids.

17.    GEO Specialty Chemicals, Inc. is a privately held Ohio corporation with its principal place of business at 340 Mathers Road, Ambler, Pennsylvania.  GEO Specialty manufactures, markets, and supplies specialty chemicals, including water treatment chemicals, for customers in the United States and internationally.  GEO Specialty has

water treatment chemical production facilities in Alabama, Arkansas, Georgia, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Texas.   During the Class Period, directly or through its subsidiaries and affiliates, GEO Specialty sold Alum throughout the United States.

> a) Around March 18, 2004, GEO Specialty filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.   Effective December 20, 2004, GEO Specialty was discharged from bankruptcy under a plan of reorganization.   GEO Specialty participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GEO Specialty's senior executives.
>
> b) After its discharge from bankruptcy, GEO Specialty reaffirmed its participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to Alum.   Specific post-discharge actions taken by GEO Specialty in furtherance of the conspiracy are alleged (see below) and are consistent with the actions taken by all of the Defendants and GEO Specialty throughout the Class Period.
>
> c) Regardless of whether GEO Specialty participated in the conspiracy throughout the Class Period or joined and/or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this complaint seeks to recover damages from GEO Specialty only

for GEO Specialty's post-discharge conduct, and in no way seeks to violate any orders of the Bankruptcy Court.  However, by operation of law, the damages arising from GEO Specialty's post-discharge conduct include damages incurred by Plaintiff and the Class throughout the Class Period.  This complaint also seeks to recover damages from the remaining Defendants for GEO Specialty's pre-discharge conspiratorial conduct.  Therefore, Plaintiff pleads only a single class period as to all Defendants, but damages as to GEO Specialty are governed by the principles of joint and several liability as noted above.

18.     C&S Chemicals, Inc. is a privately held Pennsylvania corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia.  C&S Chemicals specializes in the production of Liquid Aluminum Sulfate and Sodium Aluminate and currently operates six manufacturing facilities located in Florida, Georgia, South Carolina, Illinois, and Minnesota. During the Class Period, directly or through its subsidiaries and affiliates, C&S Chemicals sold Alum throughout the United States.

19.     USALCO, LLC is a privately held Maryland corporation with its principal place of business at 2601 Cannery Avenue, Baltimore, Maryland.  USALCO manufactures and distributes aluminum-based chemical commodities to the industrial and municipal markets in the North America.  In November 2011, USALCO acquired the assets of another Alum producer, Delta Chemical.  USALCO has manufacturing facilities

in Indiana, Louisiana, Maryland and Ohio.  During the Class Period, directly or through its subsidiaries and affiliates, USALCO sold Alum throughout the United States.

20.     Thatcher Group, Inc. is a privately held Nevada corporation with its principal place of business at 1905 Fortune Road, Salt Lake City, Utah.  Thatcher Group manufactures and distributes a complete line of products for industrial and municipal water and wastewater treatment.  Thatcher Group has manufacturing facilities in Arizona, California, Florida, Idaho, Montana, Nevada, New York, and Utah. During the Class Period, directly or through its subsidiaries and affiliates, Thatcher Group sold Alum throughout the United States.

21.     Kemira Chemicals, Inc. is a publicly held Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia. Kemira Chemicals is a subsidiary of Kemira Oyj, a Finish company with its principal place of business in Helsinki, Finland.  Kemira Chemicals is the successor company to Kemiron Companies, Inc.  Kemira Chemicals maintained a 60% ownership interest in Kemiron Companies, Inc.[2] prior to May 2005, but Kemira Chemicals purchased the remaining 40% shares in May 2005.  Kemira Chemicals manufactures, formulates, and supplies specialty and process chemicals for paper, water treatment, mineral slurries, and industrial chemical industries in North America and internationally.  Kemira Chemicals has water treatment chemical manufacturing facilities in Alabama, California, Florida,

---

[2] Kemiron Chemicals, Inc. began business in 1992 and was founded by Lawrence Hjersted.  Kemiron Chemicals was headquartered in Barstow, Florida and was one of the largest manufacturers of aluminum-based chemicals in North America.  Hjersted sold his remaining ownership interest in Kemiron Chemicals, Inc. to Kemira Chemicals in May 2005.

Georgia, Kansas, Missouri, North Carolina, Ohio, Texas, and Washington. During the Class Period, directly or through its subsidiaries and affiliates, Kemira Chemicals sold Alum throughout the United States.

22. Upon information and belief, Defendants John Does 1 through 50 are corporations and/or entities whose true names and capacities, or otherwise, are unknown to Plaintiff. Therefore, Plaintiff sues such John Does 1 through 50 by such fictitious names. Further, upon information and belief, Plaintiff alleges that each of the fictitiously named Defendants is in some manner responsible for the events alleged herein and that Plaintiff's damages were proximately caused by such John Doe Defendants.

23. Defendants engaged in the conduct alleged in this complaint, and the Defendants' officers, agents, employees, or representatives engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs.

## IV.    UNIDENTIFIED CO-CONSPIRATORS

24. Various other persons, firms, entities and corporations, not named as Defendants in this complaint, participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

25. The true names and capacities, whether individual, corporate, associate, or representative are unknown to Plaintiff at this time. Plaintiff may amend this complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

26.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, willingly conspired with Defendants in their unlawful price-fixing and bid-rigging conspiracy as described herein.

27.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## V.     FACTUAL ALLEGATIONS

### A.     <u>BACKGROUND REGARDING THE ALUM INDUSTRY.</u>

28.     Alum is a water treatment chemical that removes impurities and other substances from water. Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $Al_2(SO_4)_3$. In its most common uses in the municipal water system and paper industries, Alum is a source of A13+, which is a highly charged ionic "species" that attracts negative particles, such as those that discolor raw water supplies, reacts with negative particles, and then precipitates those participles out of the solution as ionic solids. *See* Donaldson, Lisa, FERNZ Chemicals NZ Ltd.

29.     Aluminum sulfate has been in use since 2000 B.C. Ancient uses for Alum include use by Ancient Egyptians as a dyeing agent and to clarify water in cisterns overnight for the next days' consumption.

30.     Alum is a coagulant widely used to remove existing contaminants from the water, so that the concentration of these contaminants is reduced and the water is

acceptable by the consumer for their end use.  Essentially, it aggregates small particles into larger particles that fall to the bottom of a vessel for removal.

31.     Alum also is important in the treatment of municipal wastewater.  Alum helps municipalities comply with environmental regulations concerning total organic carbon (TOC), turbidity, and phosphorous effluent discharge levels.

32.     One of the reasons that Alum has become widely accepted as a water treatment chemical is because of its chemical efficiency and stability.  Compared to its alternatives, such as anhydrous or aqueous ammonia, that are hazardous and require pressurized storage tanks and special handling and safety procedures, the storage and handling of Alum is significantly easier and safer.  Because of the efficient and safe characteristics of Alum, many municipalities and pulp and paper companies have been its principal and loyal customers.

33.     Alum is sold by the ton and transported to customers by rail or truck, usually from the Alum supplier's closest manufacturing plant.  One factor Alum suppliers consider in deciding whether to bid or quote on a contract is whether the business is "freight logical," that is, whether the liquid aluminum sulfate supplier can make a profit on the business taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

34.     During the Class Period, Defendants and their co-conspirators manufactured, among other things, performance chemicals utilized for water treatment and chemical processing.

35.     Municipalities routinely purchase Alum to treat potable water and wastewater.  Municipalities acquire Alum through a publicly-advertised bidding process, and municipal contracts for Alum are typically one year in duration with options to renew for a certain period of time.  The awards of such municipal contracts are typically made public.

36.     Pulp and paper manufacturers typically acquire Alum by issuing requests for price to manufacturers, including Defendants.  Supply contracts are then negotiated, often with terms of a year or more.  Unlike the municipal bidding process, results of the negotiations between Alum suppliers and pulp and paper manufacturers are usually not disclosed to the public.

37.     Water treatment service providers purchase large quantities of Alum to reduce phosphorous, and resulting algae, that can accumulate in lakes due to surface runoff.  With increasing environmental regulations allowing lower levels of phosphorous in surface water, reduction of phosphorous levels in lakes through use of Alum is increasingly necessary.

38.     On information and belief, sales of Alum by Defendants and their co-conspirators in the United States during the Class Period totaled hundreds of millions of dollars.

**B.      THE CHARACTERISTICS OF THE ALUM MARKET IN THE UNITED STATES MAKE IT SUSCEPTIBLE TO COLLUSION.**

39.     Publicly available data on the Alum industry demonstrates that it is susceptible to cartelization by the Defendants and their co-conspirators.  Factors that

made the Alum market susceptible to collusion during the Class Period include: (1) a standardized product for which competition was principally on the basis of price; (2) stable or declining input costs for much of the Class Period; (3) weak demand in a mature market; (4) the lack of available economic substitutes; (5) high barriers to entry; (6) price increase announcements following opportunities to collude; (7) industry concentration and consolidation; and (8) a history of collusive conduct in the Water Treatment Chemicals Market.

1.     *Alum Is A Commodity Product With A High Degree Of Interchangeability.*

40.     Typically, when a product is characterized as a commodity, market participants compete principally on the basis of price rather than other attributes such as product quality.  When competition occurs principally on the basis of price it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors.  Research conducted by industry analysts and leading manufacturers indicates that Alum is a commodity product and competition in the market is driven principally by price.

41.     Alum is a commodity product with specific specifications for iron content, specific gravity, density, and color, as shown below.[3]

---

[3] *Chart from http://www.usalco.com/products/aluminum-sulfate-solution-alum.*

**Typical Properties**

| Property | UM | Alum |
|---|---|---|
| Al2O3 | Wt.% | 8.28 |
| Fe2O3 | ppm | 50 max |
| Specific Gravity@ 60°F | – | 1.33 |
| Baume @ 60°F | – | 35.77 |
| Density | – | 11.08 |
| Color | Lbs/Gal | Clear to Amber or Light Green |
| Dry 17% Alum | Wt.% | 48.20 |

42.     A 2006 report noted the increased commoditization of Alum and other chemicals in the North American water treatment market.  A 2009 report by the Water Research Foundation stated "[a]lum is a commodity chemical."  More recently, a 2012 analyst report described inorganic coagulants such as Alum as "commodity chemicals that are relatively easy to manufacture."  A 2015 analyst report noted that the water management chemicals market is split into two major categories: specialty chemicals and "[c]ommodity chemicals such as alum."

43.     Dry alum and liquid alum that are produced domestically have been viewed by the United States International Trade Commission as "like" products to dry alum imported from abroad, given their interchangeability, common uses, common channels of distribution, common manufacturing facilities and production employees, customer perceptions and price. *Aluminum Sulfate from Venezuela*, Inv. Nos. 701-TA-299, 7431-TA-431 (Final), USITC Pub. 2242 at 4-5 (December 1989); *Dry Aluminum Sulfate from Sweden*, Inv. No. 731-TA-430 (Preliminary), USITC Pub. 2174 at 10 (March 1989).

     2.     *Input Costs For Alum Were Stable Or Declining For Much Of The Class Period.*

44.     Rising input costs for Alum cannot explain the significant price increases Defendants charged their customers between 1997 and 2010.

45.     Alum is manufactured by combining sulphuric acid with aluminum trihydrate (aka alumina or ATH).   Aluminum trihydrate is purified from bauxite by dissolving the bauxite ore in strong caustic soda to form sodium aluminate, which is then precipitated by neutralization to form aluminum trihydrate.  *See* Donaldson, Lisa, FERNZ Chemicals NZ Ltd.

46.     As shown by the graph below, bauxite (the raw material for alumina) prices fell markedly during the period from 1991 to 2003, declining almost 50%.  From 2003 to 2007, bauxite prices rose around $6 per ton, but leveled off and declined slightly by the end of 2007.  From 2008 to 2010, bauxite prices declined a further $3-$4 per ton.



47.    According to a 2014 article by Forbes, alumina pricing is traditionally about 12-14% of the price of the more transparent price quoted for aluminum on the London Metal Exchange.  Aluminum prices were relatively stable for much of the Class period from 1997 to early 2006, with a large increase in 2007 and 2008, then a rapid crash in prices in late 2008 and early 2009.

48.    Sulphuric acid costs were also relatively stable from 1997 to 2007.  A brief spike in sulphuric acid prices in 2008 was followed by a crash in prices by early 2009 and historically low prices for the remainder of 2009 and 2010.

49.    During the early part of the Class Period from 1997 to 2004, Alum prices experienced significant price increases.  According to data from the Chemical Market Reporter, from 1998 to 2004 liquid aluminum sulfate prices increased approximately 33.8% to 38%, while prices for dry aluminum sulfate increased approximately 220% to 236%.  During the period from 1998 to 2004, there were numerous parallel price increases by Defendants including, but not limited to, the following announcements publicly reported by chemical industry publication Chemical Market Reporter (now "ICIS"):

a)    General Chemical and GEO announced identical Alum price increases of $15 per ton on August 10 and August 31, 1998.

b)    General Chemical and GEO announced identical Alum price increases of $15 per ton on October 4 and October 18, 1999.

c)    Southern Ionics, GEO, and General Chemical announced Alum price increases of $8-$9 per ton around December 2000.

d)   Kemiron Companies, General Chemical, and GEO announced identical Alum price increases of $10 per ton between November 21 and December 12, 2003.

e)   USALCO and General Chemical both announced Alum price increases effective December 1, 2004, which were subsequently reported by ICIS on December 3, 2004.

50.   The declining or at best stable pricing of the primary input costs of Alum – alumina and sulphuric acid – cannot explain the rise in Alum prices from 1998 to 2004. Instead, Defendants' illegal conspiracy to fix the price of Alum resulted in Plaintiff and Class Members paying artificially inflated prices.

51.   A 2009 report by the Water Research Foundation analyzed a survey about the rising costs of water treatment chemicals during the period between January of 2008 and January of 2009 that was administered by the Association of Metropolitan Water Agencies and to which forty-seven United States drinking water utilities responded. Twenty-five of those entities reported using Alum and, during the period of that single year, reported an average 53% price increase, with maximum increases being as high as 168%. While raw material cost increases were cited as a major cause of these increases, as noted above, the report noted the "boom" in commodities prices was over by mid-2008.

52.   As GenTek reported in its 2009 Form 10-K for the year, price increases on products such as Alum contributed significantly to the profits earned by GenTek on successful bids or responses to RFPs in the water treatment market: "[s]ales into the

water treatment market increased by $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting from increases in selling prices….." Upon information and belief, GenTek's increased profits in 2008 were due to Defendants' conspiracy to artificially increase the price of Alum in the United States.

> 3.   *Alum Experienced Weak Demand In A Mature Market During The Class Period.*

53.   Static or declining demand makes the formation of a collusive arrangement more likely.   In a competitive market, when faced with static or declining demand conditions, firms often will attempt to increase sales by taking market share from competitors by decreasing prices.   For this reason, firms faced with static or declining demand have a greater incentive to collude to avoid price competition with competitors and protect against bankruptcy.

54.   Demand for Alum is driven by the demand for end-use markets in which it is employed.   These markets include water treatment and the pulp and paper industry. According to one 2004 article, "demand for alum has slowed due to retraction and consolidation in the pulp and paper market, a major market for alum."

55.   Figure 1 below illustrates actual revenues and unit shipments for the North American coagulants and flocculants market in the U.S. from 2003 to 2006.   As shown, demand was relatively stable during these years and was forecast to continue to increase only slightly from 2007 through 2010.



*Source: Frost & Sullivan, "North American Industrial Water Treatment Chemicals Markets," August 31, 2007.*

56.     Kemira's parent company in its 2008 annual report described demand as follows: "Only modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

57.     One 2001 article described the Alum market as "very mature, with a projected annual growth rate of roughly 2 percent."  A 2004 Chemical Market Reporter article noted that aluminum sulfate is a mature commodity market.  Similarly, a 2015 analyst report notes that the "technologies currently used in water treatment are mature." As a mature market, future sales of Alum are determined by population growth.  In its 2013 annual report, Chemtrade Logistics, which acquired General Chemical in 2014, noted that the "North American market for water treatment chemicals generally tracks GDP and population growth."

58.     A 2003 article in ICIS included an interview with General Chemical's

Marketing Manager Karla Doremus-Tranfield, noting "[t]he Alum market is generally

balanced, 'No new suppliers have come into the marketplace, and its end users are well

understood . . . And it's a mature market, one of the most mature,' she adds, noting that

ancient Egyptians used alum."

59.     In mature industries, firms' ability to increase sales is limited to population

growth and the replacement of existing products.  This means that slow growth rates

often exist in mature industries because new distribution channels, which might raise

sales, have typically been exhausted.  Consequently, the only way for firms operating in

mature industries, where demand growth is slow, to capture additional market share is by

competing with each other on the basis of price.  This factor is exacerbated in industries

for commodity products" such as Alum, since product differentiation would not be an

alternative way to gain market share.

    *4.*    *There Are No Apparent Economic Substitutes For Alum.*

60.     The lack of available substitutes for a product facilitates collusion among

producers, because customers are not able to avoid supra-competitive prices for Alum by

switching to another type of inorganic coagulant.

61.     There are several substitutes for Alum such as aluminum chloride,

polyaluminum chloride (PAC), aluminum chlorohydrate, ferric sulfate, and ferric

chloride.  However, while these goods can be functional substitutes for Alum, they are

not necessarily economic substitutes for Alum.  An article from Chemical Market

Reporter notes that "[b]ecause PAC compounds are processed more than basic water

treatment chemicals like aluminum sulfate, they are pricier. The PAC family, which includes aluminum chloride, PAC and aluminum chlorohydrate, accounts for 15 percent of the water treatment market. Alum is the most mature product and has a market share of more than 40 percent." Another article states that the market for Alum benefited from the "recent trend toward phosphorous reduction in water treatment as municipalities turn back to alum from iron salts – which are less efficient binders than aluminum compounds – as the most cost-effective method of lowering phosphorous levels."

62.     A further reason that other chemicals are not true substitutes for Alum at water treatment facilities is because each chemical is dosed and applied differently at water treatment facilities. Therefore, there are substantial infrastructure and other costs associated with switching the treatment chemical used by any particular water treatment facility. Further, other water treatment chemicals are typically more expensive than liquid aluminum sulfate

63.     Economists regard products as economic substitutes if a nominal change in price for one product results in increased demand for the other product. The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent. Given the quality and cost differences discussed above, there do not appear to be any economic substitutes for liquid aluminum sulfate.

### 5.     *There Are Significant Barriers to Entry in the Alum Market.*

64.     Supra-competitive pricing in a market normally attracts additional competitors who want to avail themselves of the available high levels of profitability.

However, significant barriers to entry makes new competition more difficult and facilitates the operation of a cartel.

65.     There are significant barriers to entry which have prevented potential competitors from effectively competing in the U.S. Alum market during the Class Period. An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers." These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements. High barriers to entry also exist because only a determined competitor with specialized technical knowledge, the capital necessary to build costly manufacturing facilities, and access to distribution channels could have competed in this market.

66.     According to industry experts, the Alum market had no new entrants during the Class Period. In 2003, General Chemical's Marketing Manager Karla Doremus-Tranfield noted that no new suppliers have come into the marketplace. Since 2010, the only significant new entrant in the Alum industry is Affinity Chemical LLC. Affinity Chemical LLC was formed in 2011 by Defendant Reichl, who pled guilty to price fixing Alum on October 27, 2015.

                6.    *Opportunities to Collude Facilitated Defendants' Conspiracy.*

67.     As noted in Reichl's indictment, there were countless opportunities for Defendants to communicate and conspire with each other and their co-conspirators. Defendants and their co-conspirators regularly met and discussed each other's business, entered into "not-to-compete" agreements, allocated customers and submitted artificially

inflated bids. *See* Indictment ¶ 13, *United States v. Frank A. Reichl*, 2:15-cr-00554 (D.N.J.).

68.     Notably, representatives, including Reichl, from General Chemical frequently attended national and local industry conferences where they had the opportunity to meet with co-Defendants and collude.   For example, in May 2001, Christopher B. Lind of General Chemical attended the Florida Lake Management Society's Twelfth Annual Conference (Booth #21).   Similarly, in June 2004, General Chemical attended the Florida Lake Management Society's 15th Annual Conference.

69.     The American Water Works Association ("AWWA") also permits Defendants numerous opportunities to collude.   In addition to national level meetings, trainings, and networking events, there are over forty state or regional AWWA sections that hold their own meetings, trainings, and networking events.   For instance, the Southwest Section of the AWWA includes Alum producers Affinity Chemical (including Frank Reichl), Chemtrade, and Kemira.   Other Defendants, such as Thatcher, participate in various other regional AWWA sections.

70.     The American Chemistry Council ("ACC") is America's oldest trade association of its kind and includes companies engaged in the business of chemistry. Defendants attended ACC's regular meetings and conferences, including executives from Chemtrade, GenTek, and Kemira.   Additionally, other Alum manufacturers attended ACC meetings, including Univar and PVS Chemicals.

71.     Notably, Reichl frequently participated in industry conferences for many years where he had the opportunity to meet with co-Defendants and collude, including

the Arkansas Water Works & Water Environment Association, Southwest Section of the American Water Works Association, and Georgia Association of Water Professionals. Reichl attended such conferences with representatives from many competitors including Kemira and Affinity Chemical LLC.

72.     Defendants' attendance at industry conference and trade associations facilitated coordinated price increase announcements by Defendants.  For instance, on December 3, 2004, ICIS, which purports to be "the world's largest petrochemical market information provider," issued an article titled "Aluminum Sulfate Prices Rise with Demand and Costs."  Through this medium, Rich Fedison, director of sales and marketing for Defendant General Chemical Performance Products LLC, signaled to the market that demand for aluminum sulfate was stable and beginning to strengthen.  He stated: "The pulp and paper sector is finally beginning to recover after several years of poor performance as sustainable price increases and the recovering global economy are driving margin improvement.  On the municipal water side, tightening federal regulations on total organic compounds and disinfection byproducts are contributing favorably to the overall demand for inorganic coagulants."  Significantly, Fedison stated, "**[a]ll announced price increases for aluminum based inorganic coagulants are continuing to hold in all end-use markets**" (emphasis added).  This statement was a signal to co-Defendants, providing a pretext for maintaining the artificially inflated price level for aluminum sulfate.

73.     Contemporaneously, Defendant General Chemical Performance Products LLC raised its list prices for commercial-grade aluminum sulfate to $335 per ton on the

East and Gulf Coasts and $370 on the West Coast.  Liquid material in tanks was $214 per ton, iron-free liquid material in tanks was $331 per ton, and dry iron-free aluminum sulfate was $425 per ton.

74.     At the same time, USALCO raised its prices for aluminum sulfate by $10 per dry ton, effective December 1, 2004, or as contracts permitted.

75.     Also at the same time, Kemiron Companies raised its prices for all grades of polyaluminum chloride, aluminum chloride, aluminum chlorohydrate, sodium aluminate and polyaluminum sulfate by 2 cents per pound, effective December 1, 2004, or as contracts allowed.

7.     *The Alum Industry Is Highly Concentrated And Has Experienced Heavy Consolidation.*

76.     The Alum industry is highly concentrated, dominated by a small number of national or global companies, with a larger number of small regional Alum producers.

77.     The Alum industry experienced heavy consolidation in the period leading up to and including 1997.  One producer, GEO Specialty made several acquisitions between 1993 and 1997.  In June 1993, GEO Specialty acquired the Gulf Coast alum business and customer list of Rhone Poulenc, a large French chemical company that exited the United States market with the sale.  In December 1996, GEO Specialty acquired Cytec's Alum business, which included seven Alum plants in the Southeast. GEO Specialty's purchase of Cytec made it a major national supplier of Alum immediately before the start of the Class Period.  In March 1997, GEO Specialty announced that it was acquiring the U.S. and Canadian paper chemicals business of

Henkel Corporation.   In September 1998, Denny Grandle, GEO Specialty VP and General Manager, Aluminum Products Division, commented that "[t]he consolidation has helped capacity," noting that GEO Specialty has recently closed an Alum plant in Spring Hill, Louisiana.

78.    In June 1997, General Chemical purchased Augusta Georgia-based Peridot, a producer of sulfuric acid, Alum, and oleum.

79.    General Chemical and GEO Specialty's acquisitions immediately before the start of the Class Period left them with the largest Alum market shares by 1998. According to an October 1999 ICIS article, "[p]rior to 1998, the alum industry went through a period of stiff competition that triggered a downturn in its major markets." However, according to the same article, around 1998 Alum prices started shifting upwards.

80.    The acquisitions continued throughout the Class Period.   In August 2003, Kemira Chemicals expanded its holdings in US-based company Kemiron Companies Inc., a leading manufacturer of water treatment chemicals, from 15% to 60%.   In 2004, Kemiron acquired Eaglebrook International Group, Ltd., a leading manufacturer and distributor of water treatment chemicals located in Matteson, Illinois.   In May 2005, Kemira strengthened its position in the North-American water treatment business through the purchase of the remaining 40% shares in Kemiron Companies Inc.   In October 2006, Kemira Chemicals' parent company, Kemira Oyj, acquired Cytec Industries Inc.'s water treatment chemical and acrylamide business.   In February 2007, General Chemical acquired Chalum, Inc., an Arizona-based aluminum sulfate producer.

81. The concentration of the Alum industry is also enhanced by agreements among Defendants to distribute one another's products. Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market such as Alum in the United States also facilitates the formation of collusion among ostensible competitors.

8. *There Is A History Of Collusive Conduct In The Water Treatment Chemicals Market.*

82. The water treatment chemicals market has a history of collusion.

83. In the 1980s, manufacturers of chlorine allegedly conspired to rig bids submitted to municipal water facilities, including by submitting non-competitive bids to municipalities for customers they had agreed to allow their competitors to have in the Southeast.

84. Similarly, two other chemicals used by water treatment facilities and paper companies – hydrogen peroxide and sodium chlorate – were the subjects of alleged antitrust conspiracies. First, from 1994 to 2005, producers of hydrogen peroxide settled claims of price-fixing for tens of millions of dollars. Significantly, Defendant Kemira settled the hydrogen peroxide class action for $5 million, in addition to settlements for undisclosed sums with direct action litigants. Second, in 2008, Kemira Oyj's subsidiary, Kemira Chemicals (formerly Finnish Chemicals Oy) was fined EUR 10.15 million for antitrust activity in its sodium chlorate business from 1994 to 2000.

C.      **U.S. DOJ INVESTIGATION AND GUILTY PLEA**

85.     On March 4, 2014, Defendant CLIF issued an Annual Information Form

("AIF") for calendar year 2013, the year it commenced the Chemtrade Acquisition.   In

that AIF, it stated:

> Chemtrade is currently a subject of an ongoing investigation
> by the U.S. Department of Justice concerning alleged
> anticompetitive conduct in the water treatment chemicals
> industry.  Chemtrade is cooperating with the investigation and
> has the benefit of the conditional amnesty and a leniency
> "marker" from the U.S. Department of Justice for its conduct
> regarding sales of the water treatment chemicals under
> investigation which General Chemical had obtained prior to
> the General Chemical Acquisition.   The investigation may
> result in separate civil litigation being initiated against
> Chemtrade.  In addition, there is a risk that Chemtrade could
> become ineligible for a period of time to do business or bid
> for new contracts with certain municipal or other government
> customers as a consequence of its conduct, and thereby could
> lose some or all of its municipal and other government water
> treatment chemicals business in certain jurisdictions for a
> period of time.  Chemtrade does not anticipate that the costs
> associated with the investigation or related matters will have a
> material adverse impact on its business or operations.   The
> vendors pursuant to the General Chemical Acquisition have
> agreed to indemnify Chemtrade for certain losses that could
> result from the conduct that is the subject of this
> investigation.

86.     On March 5, 2015, CLIF issued an AIF for calendar year 2014 stating that:

> Chemtrade is currently a subject of an ongoing investigation
> by the U.S. Department of Justice concerning alleged
> anticompetitive conduct in the water treatment chemicals
> industry.  Chemtrade is cooperating with the investigation and
> has the benefit of the conditional amnesty from the U.S.
> Department of Justice for its conduct regarding sales of the
> water treatment chemicals under investigation which General
> Chemical had obtained prior to the General Chemical
> Acquisition.   The investigation may result in separate civil

litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations.  The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.

87.     The significance of CLIF obtaining conditional amnesty under the DOJ's corporate leniency program is explained on the DOJ's website[4]:

**5.** *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

88.     On October 27, 2015, the Antitrust Division of the Department of Justice ("DOJ") announced that Frank A. Reichl had agreed to plead guilty to participating in a conspiracy to eliminate competition by fixing prices, rigging bids and allocating customers for Alum.

---

[4]     http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program (last visited November 19, 2015).

89.     Based upon information, belief and research, Reichl was the Vice President of Sales and Marketing for General Chemical between 2006 and 2010.  Prior to that time, during the Class Period, he also served as General Manager of Water Chemicals for General Chemical.  In both positions, Reichl's responsibilities included oversight of the sale and marketing of water treatment chemicals, including Alum.  Reichl was responsible for pricing, strategy, analyzing and approving bid and pricing proposals, and supervising General Chemical's sales and marketing employees.

90.     During the relevant period, Reichl was responsible for the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, except for the period from approximately July 2005 to approximately December 2006, when he was employed in other components of General Chemical that were not engaged in the sale and marketing of water treatment chemicals.  Prior to July 2005, Reichl was General Manager of Water Chemicals.  After approximately December 2006 until the termination of his employment with General Chemical in 2010, Reichl was Vice President of Sales and Marketing.  As both General Manager and Vice President, Reichl oversaw the sale and marketing of water treatment chemicals, including Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees of General Chemical.

91.     According to the October 27, 2015, criminal information[5] filed against Mr. Reichl, Mr. Reichl and his co-conspirators "entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale of marketing of [Alum]

---

[5] *United States v. Frank A. Reichl*, No. 2:15-cr-00554, ECF Dkt. 1 (D.N.J. Oct. 27, 2015).

by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States," which conspiracy constituted a "continuing agreement, understanding, and concert of action among Reichl and his co-conspirators."

92.     Further according to the criminal information, while he was employed by General Chemical, Reichl and his co-conspirators carried out the conspiracy by, *inter alia*:

  a)     participating in meetings and/or conversations to discuss each other's Alum business and the price of Alum in the United States;

  b)     agreeing during those meetings and conversations not to pursue Alum business with each other's "historical" customers;

  c)     tracking bid and pricing histories in order to determine if a customer was the "historical" customer of another co-conspirator in order to determine whether or not to pursue that potential customer's business or submit intentionally losing, "throw-away" bids or price quotes;

  d)     submitting intentionally losing, "throw-away" bids or price quotes to each other's "historical" customers;

  e)     discussing prices to be quoted to customers by the intended winner of the customers' business in order to determine the amount of the intended losers' intentionally losing, "throw-away" bids or price quotes;

f)      withdrawing inadvertently winning bids submitted to each other's "historical" customers;

g)      intentionally bidding to lose the business of one of their own "historical" customers if an inadvertently winning bid to one of its co-conspirator's "historical" customers could not be withdrawn; and

h)      instructing employees how to determine whether and how to bid or price quote potential business in order to comply with the agreement not to compete.

93.     The fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant.  The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations."  *See Antitrust Division Manual*, Chapter III.C.

**D.      DEFENDANTS' CONDUCT IS CONSISTENT WITH REICHL'S GUILTY PLEA.**

94.     Defendants acted in conformance with the conduct described in Mr. Reichl's guilty plea on numerous occasions since at least 1997.  As described below, three categories of conduct in particular are borne out by Defendants' course of dealings with municipal water authorities as revealed by publicly available bid history information: (1) agreements not to pursue historical customers; (2) submission of

intentionally losing bids; and (3) withdrawal of inadvertently winning bids to other Defendants' historical customer.

1.   <u>*Evidence Shows That Defendants Agreed Not To Pursue Alum Business With Each Other's "Historical" Customers.*</u>

95.   Paragraph 13(b) of the Reichl Criminal Information states Reichl and his co-conspirators combined and conspired to stay away from each other's historical customers by not pursuing the business of those customers.

96.   Numerous municipalities have experienced situations during the Class Period where only a single company bids on their Alum requests for bids.  Below are a few examples of such conduct during the Class Period.

       a)   When Bellingham, Washington, solicited bids from seven companies for the 2006 calendar year, only General Chemical responded. General Chemical had also been the bid winner in 2004 and 2005. From 2004 to 2006, General Chemical's price to Bellingham increased from $198.54 per ton to $280.49 per ton, an increase of 41% in only two years, during a period in which input costs for Alum were stable.

       b)   When Pittsburg, California, put out bid requests in both 2008 and 2009 for Alum, General Chemical's was the sole bid received despite the City's efforts to send bid requests to 13 other vendors, including Univar USA, Brenntag Pacific, Nalco Chemical, and others.  Between 2007 and 2008, General Chemical increased the

price charged to Pittsburg 60%, and represented to the city that the price increases were due to increased worldwide competition and fuel and energy cost used to manufacture and transport the chemicals in large quantities.

c)    In 2009, the City of Frankfort, Kentucky, received no responses to its request for bids, so was forced to purchase Alum from General Chemical which indicated it was "the regional Liquid Alum distributor for th[e] area."

97.    Upon information and belief, these sole bid episodes described above are only examples, and were in furtherance of Defendants' conspiracy to eliminate competition in the Alum market in the United States.

2.    *Defendants And Their Co-Conspirators Submitted Intentionally Losing, "Throw-Away" Bids Or Price Quotes To Each Other's "Historical" Customers.*

98.    Paragraphs 13(c)-(d) of the Reichl Criminal Information states that Reichl and his co-conspirators conspired to intentionally submit losing, throw-away bids or price quotes to each other's historical customers.

99.    Numerous municipalities have experienced bid patterns during the Class Period where winning and losing bids are wildly different from one another. Based on Reichl's guilty plea, such bid patterns are explained by Defendants' agreement to submit throw-away bids to one another's historical customers. Below are a few examples of such conduct during the Class period.

a) In April 2004, Thatcher received a contract to supply Alum to Great Falls, Montana, with a price of $188 per ton. The only other two bidders were Kemira and General Chemical, which submitted bids of $216 and $300, or 15% and 60% higher than the winning bid, respectively.

b) In March 2005, USALCO received a three-year contract to supply Alum to Grand Rapids, Michigan, with a price of $149.52 per ton. The only other two bidders were General Chemical and C&S Chemical, which submitted bids of $186.94 and $232, or 25% and 55% higher than the winning bid, respectively.

c) In October 2008, General Chemical received a contract to supply Alum to Fayetteville, Arkansas, with a price of $184.2 per ton. The second-lowest bidder was C&S Chemical, with a bid of $247.6 per ton, or 34.4% higher than General Chemical's bid. Similar, the only two other bidders – Kemira and GEO Specialty – bid 37% and 43% higher, respectively.

d) In May 2009, General Chemical received a contract to supply Alum to Milwaukee, Wisconsin, with a price of $429 per ton. The only other bidder, USALCO, submitted a bid of $562 per ton, or 31% higher than General Chemical's winning bid.

e) In July 2009, General Chemical received a contract to supply Alum to the City of Fresno, California, with a price of $.1482 cents per

pound.  The next lowest bidder was Thatcher, with a bid of $.171 cents per pound, or over 15% higher.

f)      In September 2009, General Chemical received a contract to supply Alum to the City of Neenah, Wisconsin, with a price of $460 per dry ton.  The only other bidder was USALCO with a bid of $589.91 per ton, or 28% higher than General Chemical's winning bid.

g)      In June 2010, General Chemical received a contract to supply Alum to Pensacola, Florida, with a price of $212.93 per ton.  While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219 per ton, the other large national Alum producers, GEO Specialty and C&S Chemical, bid prices which were an astounding 117.7% and 162% higher than General Chemical's winning bid.

100.   Upon information and belief, the losing bids described above are only examples, and were in furtherance of Defendants' conspiracy to eliminate competition in the Alum market in the United States.

3.      *Defendants Withdrew Inadvertently Winning Bids Submitted To Each Other's "Historical" Customers.*

101.   Paragraph 13(f) of the Reichl Criminal Information states that Reichl and his co-conspirators conspired to withdraw inadvertently winning bids to co-conspirators' historical customers.   A number of municipalities have experienced Defendants'

withdrawing their successful bids, oftentimes with pretextual justifications that such winning bids were due to "clerical errors."

102.    For instance, in December 2005, General Chemical submitted the winning bid for a one-year supply contract for Rochester.  However, General Chemical's winning bid was then withdrawn, leaving C&S Chemical as the winning bidder for the 2006 calendar year.

103.    On October 6, 2009, General Chemical won a bid to supply Alum to Phenix City, Alabama.  However, two weeks later, that winning bid was rescinded and the only other bidder – C&S Chemical – was awarded the contract.  Upon information and belief, General Chemical's withdrawal of its winning bid was in furtherance of Defendants' conspiracy.

104.    Defendants' conduct of withdrawing winning bids also extends to a related coagulation chemical called ferric sulphate.   In May 2008, General Chemical was awarded a contract to supply Plaintiff with ferric sulphate, a chemical used for coagulation.  However, within days, General Chemical contacted Plaintiff to withdraw its bid, claiming its bid was lowest due to a "clerical error."  Similarly, in July 2009, Kemira won a bid to supply ferric sulphate to Austin, Texas, but when Kemira requested to withdraw its bid, General Chemical won instead.

## VI.    CLASS ACTION ALLEGATIONS

105.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this action on behalf of the following class:

> All persons and entities in the United States who purchased Liquid Aluminum Sulfates directly from Defendants, from 1997 to July 31, 2010, or until the cessation of the anticompetitive effects of Defendants' conduct as alleged in this complaint.

106.   Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

107.   Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are hundreds, if not thousands of Class Members. Further, the Class is readily identifiable from information and records maintained by Defendants.

108.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

109.   Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.   In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

110.   Defendants have acted on grounds generally applicable to the entire Class, therefore injunctive relief is appropriate.   Such generally applicable conduct is inherent in Defendants' wrongful conduct.

111.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members Questions of law and fact common to the Class include:

a)     whether Defendants and their co-conspirators conspired to fix prices, rig bids, and allocate customers of Alum sold in the U.S.;

b)     the duration and extent of the alleged conspiracy;

c)     the identity of the conspirators;

d)     the effect of the conspiracy on the prices of Alum sold in the U.S. during the Class Period;

e)     whether Defendants engaged in fraudulent concealment;

f)     whether the alleged conspiracy violated the Sherman Act, § 1;

g)     the nature and extent of damages and injunctive relief to which Plaintiff and the Class Members are entitled; and

h)     whether Plaintiff and the Class Members should be awarded attorneys' fees and costs.

112.    Class action treatment is superior to any alternative method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

113.    Class action treatment also is superior to any alternative method to compensate the victims of Defendants' conspiracy – Plaintiff and the proposed Class –

for the injuries they have suffered as a direct result of Defendants' conduct. The DOJ has disavowed any intention to seek restitution from Reichl for the victims of his criminal conspiracy in light of the existence of civil causes of action such as Plaintiff's complaint, "which potentially provide for a recovery of a multiple of actual damages the United States and Reichl agree that any sentencing recommendation either party may make to the Court will not include an order of restitution for the offense charged in the Information." *U.S. v. Reichl*, No. 2:15-cr-00554-JLL (D.N.J.), Dkt. No. 5, at ¶ 14.

114. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.   ANTITRUST INJURY

115. The effect of Defendants' and co-conspirators' anticompetitive conduct as alleged herein has been to artificially inflate the prices of Alum in the U.S. By engaging in a price-fixing and bid-rigging conspiracy, prices have been supported at artificially high levels throughout the U.S., and as a result, direct purchasers of Alum have paid supra-competitive prices.

116. According to the DOJ's press release, Defendants and their co-conspirators would agree to not compete for contracts; meet and agree to fix prices, rig bids and allocate customers; discuss and agree to submit bids intended to lose and withdraw bids that were accidently successful in order to insure that the chosen contractor won. Further, Defendants and their co-conspirators also colluded regarding the prices and bids provided

to customers.  They would submit artificially inflated bids in order to drive up prices so that customers would pay more.[6]

117.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for Alum than they would have and thus suffered substantial damages.

## VIII.  FRAUDULENT CONCEALMENT

118.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct. Plaintiff and Class Members could not have discovered the Defendants' price-fixing and bid-rigging scheme any earlier than the DOJ's October 27, 2015 press release announcing Defendant Frank Reichl's guilty plea.[7]

119.    Accordingly, Plaintiff and Class Members could not have discovered the violations alleged herein until shortly before filing this complaint. Defendants secretly conducted their price-fixing and bid-rigging schemes, concealed the nature of their unlawful conducts and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

120.    According to the DOJ's press release, Defendants and their co-conspirators would secretly meet to discuss each other's businesses, agree to submit bids intended to

---

[6] *See* "Former Executive Admits Guilt in Conspiracy Affecting Water Treatment Chemicals," available at  http://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals.

[7] *See id.*

lose, and withdraw bids that were accidently successful in order to insure that the chosen contractor won. *Id.*

121.   Not only did Defendants conduct their conspiracy in secret, they affirmatively misled their customers as to the existence of their conspiracy and its effect in raising Alum prices.  For instance, Defendants would routinely submit "anti-collusion" affidavits or sign contracts with non-collusion provisions required by various states, such as Missouri and Oklahoma, representing that Defendants had not conspired with any competitors to fix the price and/or rig the bid being submitted for Alum.   Such assurances, including under penalty of perjury, show the lengths to which Defendants went to maintain the secrecy of their illegal conspiracy.

122.   Defendants also led Alum customers and the public to believe that their price increases were attributable to increasing demand resulting from tightening government regulations, while concealing the fact of their meetings, agreements, and other conspiratorial conduct as alleged in this complaint.

123.   Defendants and their co-conspirators also submitted intentionally losing, "throw-away" bids or price quotes to each other's "historical" customers, as alleged above, while concealing from those customers the fact of their meetings, agreements, and other conspiratorial conduct as alleged in this complaint.

124.   As alleged above, Defendants and their co-conspirators on occasion withdrew successful bids, oftentimes with the pretextual justification that such winning bids were due to "clerical errors," while concealing the fact of their meetings, agreements, and other conspiratorial conduct as alleged in this complaint.

125.   As a result of Defendants' affirmative and fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and Class Members' claims have been tolled. Plaintiff and Class Members did not discover, nor could they have discovered at an earlier date through reasonable diligence that Defendants conspired as alleged herein, because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection and affirmatively conceal such violations.

126.   As a result of the Defendants' fraudulent concealment of their wrongful conduct, Plaintiff asserts the tolling of any applicable statute of limitations affecting the cause of action brought by Plaintiff and the Class Members.

## IX.   CLAIM FOR RELIEF FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

127.   Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

128.   Through the conduct alleged in this complaint, Defendants and their co-conspirators violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to increase prices and otherwise restrain competition in the market for Alum sold to Plaintiff and Class Members during the Class Period.

129.   Defendants are *per se* liable under Section 1 of the Sherman Act for the injuries and damages caused by their conspiracy in restraint of trade as alleged herein.

130.   Defendants and their co-conspirators furthered and effectuated their conspiracy in the following ways, among others:

a)      Participating in secret communications, discussions, and meetings in the U.S. and elsewhere to exchange confidential and competitively sensitive information regarding each other's Alum business;

b)      Agreeing, during those conversations and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c)      Tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d)      Submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

e)      From time to time, in the U.S. and elsewhere, discussing and agreeing during those conversations and meetings, to set a price floor to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

f)      Where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

g) Instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete between Defendants and co-conspirators.

h) Selling Alum to customers at collusive and non-competitive prices in the U.S.;

i) Defendants and their co-conspirators fixed, raised, stabilized and maintained at artificially high and supra-competitive levels the prices for Alum charged to Plaintiff and Class Members in the U.S.;

j) Defendants and their co-conspirators caused Plaintiff and Class Members to pay more for Alum than they would have paid in the absence of a price-fixing conspiracy;

k) Price competition in the sale of Alum in the U.S. was restrained, suppressed and eliminated; and

l) As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiff and Class Members sustained damages to their business and property.

131. The conspiracy had its intended effect, as prices for Alum sold in the United States during the Class Period were higher than they would have been but for the wrongful conduct of Defendants and their co-conspirators as alleged in this complaint.

132. As a result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for Alum

than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

133.   Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and Class Members request that the Court:

A.   Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.   Permanently enjoin Defendants from violating the antitrust laws by entering into and carrying out their illegal agreements, and requires them to take affirmative steps to dissipate the effects of the violation;

D.   Adjudge and decree that acts alleged herein are unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

E.   Enter judgment for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

F.   Award Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

G.     Award Plaintiff and Class Members the costs of this suit, including reasonable attorney fees; and

H.     Award such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all issues so triable.

Dated: December 21, 2015

 s/W. Joseph Bruckner
W. Joseph Bruckner (#147758)
Charles N. Nauen (#121216)
Heidi M. Silton (#25759X)
Elizabeth R. Odette (#340698)
Brian D. Clark ( #390069)
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
wjbruckner@locklaw.com
cnnauen@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com

**Attorneys for Plaintiff City of Minneapolis and the Proposed Class**